IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA; and,
NINE NAMED FEDERAL EMPLOYEES,

       Plaintiff,              CIV. S-04-1263 FCD GGH PS

   vs.

WILLIAM J. BIGGS and BETTY BIGGS,

       Defendants.       ORDER AND FINDINGS &
                                RECOMMENDATIONS
_____/

I.  INTRODUCTION

        This action, in which defendants are proceeding pro se, has been referred to the undersigned pursuant to E.D. Cal. L.R. 72-302(c)(21).  Presently pending before the court is the government's motion for summary judgment, filed October 27, 2006.[1]  After the court reviewed the papers in support of and in opposition to the motion, it ordered further briefing as the evidence submitted did not fully trace the lineage to the mining claims upon which the disputed structures stand.  The court was concerned that an innocent mining claim owner might be adversely impacted by a court order granting injunctive relief in this case, and that the Biggs

---

[1]  Hearing date of February 8, 2007 was vacated and the matter taken under submission on February 2, 2007.

1

1   might be interlopers in mining claims owned by other individuals.  Therefore, the court ordered a

2   supplemental declaration which has now been filed.  Having now reviewed that briefing, the

3   court issues the following findings and recommendations.[2]

4          This action is proceeding on the government's first amended complaint, filed

5   August 16, 2006.  It seeks relief as a result of William and Betty Biggs' ("Biggs")  use of

6   government lands for purported mining claims when it is alleged that in fact defendants have not

7   used the land for mining purposes but as residential and/or recreational property since

8   approximately 1974.  The government seeks removal of unauthorized structures from the land, an

9   injunction preventing the Biggs from using their mining claims, declaration that the government

10  is the sole owner of the structures and has a right to remove them, and declaration that the Biggs'

11  financing statements against nine federal employees[3] involved in the removal of the unauthorized

12  structure are false, fraudulent, and invalid under federal and state law, and that they be expunged.

13  The government also seeks statutory damages.

14  II. <u>SUMMARY JUDGMENT STANDARDS UNDER RULE 56</u>

15         The "purpose of summary judgment is to 'pierce the pleadings and to assess the

16  proof in order to see whether there is a genuine need for trial.'"  <u>Matsushita Elec. Indus. Co. v.</u>

17  <u>Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P.

18  56(e) advisory committee note to 1963 amendment).  Summary judgment is appropriate "if . . .

19  there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment

20  as a matter of law."  Rule 56(c).  Disputed facts must be material (affecting the outcome of the

21  suit under the governing law), and genuine (supported by evidence permitting a reasonable jury

22

23         [2]  Defendants have filed a myriad of papers, most of which are of dubious value.  To the
    extent that these papers can be construed as opposing the government's motion, they will be so
24  construed.

25         [3]  The nine federal employees are John Gisla, Jean Masquelier, Steven Eubanks, William
    Haui, Greg Schimke, Mike Dunn, George Chapman, Ren'e Barros, and David Brown.  Ex. D. at
26  p. 2, Pl.'s Mem. P. & A. Supp. Mot. Summ. J.

to return a favorable verdict).  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

The moving party:

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Rule 56(c)).

The moving party without the burden of proof at trial may rely "solely on the pleadings, depositions, answers to interrogatories, and admissions on file." Id. (citations omitted.)  That party need only point to the absence of a genuine material factual issue, and is not required to produce evidence negating the opponent's claim.  Id. at 323-24; Lujan v. National Wildlife Fed'n, 497 U.S. 871, 885, 110 S. Ct. 3177, 3187 (1990).

When the moving party meets its responsibility, the burden shifts to the opposing party.  Matsushita, 475 U.S. at 586, 106 S. Ct. at 1356.  The opposing party then must submit "significant probative evidence" on each element of his claims on which he bears the burden at trial.[4]  Barnett v. Centoni, 31 F.3d 813, 815 (9th Cir. 1994).  Unverified denials in pleadings are insufficient.  Neither can conclusory statements defeat a properly supported motion.  Scott v. Rosenberg, 702 F.2d 1263, 1271-72 (9th Cir. 1983).  Rather, specific facts in the form of affidavits or admissible discovery material must be submitted.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n.11.

The opposing party need not conclusively establish any fact.  To demonstrate a genuine dispute, however, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead

---

[4]  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 322.

1  a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

2  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).  In other words, the evidence

3  must demonstrate that a trial is required to resolve the parties' differing versions of the truth.

4  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

5          The court believes the evidence of the opposing party, Anderson, 477 U.S. at 255,

6  106 S. Ct. at 2513, and draws all reasonable inferences in its favor, Matsushita, 475 U.S. at 587,

7  106 S. Ct. at1356.  Nevertheless, inferences are not drawn out of the air, and the opposing party

8  must produce a factual predicate from which to draw an inference.  Richards v. Nielsen Freight

9  Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985).

10  III.  FACTUAL BACKGROUND[5]

11          The history of the mining claims at issue is complicated as there were various

12  claims over the years, including some claims originally owned by a Mr. P.D. Vail, but which the

13  Biggs represented as claims they were working and eventually bought from Vail.[6]  Schimke

14  Suppl Decl., ¶ 19.[7]  Most of these claims were later either declared void or forfeited, but currently

15  the Biggs have two mining claims which are still valid.  Id. at p. 2.  For ease of reference, all

16  mining claims will be referred to herein as the Biggs mining claims.  All claims pertain to the

17  same piece of property, located in the Tahoe National Forest.  The unauthorized structures at

18  issue in this case are located on the Crescent # 2 mining claim, currently registered to the Biggs

19

20          [5]  The Biggs have not submitted a statement of facts which they contend are disputed or
undisputed, in accordance with E.D. Local Rule 56-260(b).  Therefore, the government's version
21  of the facts is accepted as true and is repeated as necessary.  See Pl.'s Mot. at 3-18.  To the extent
that defendants attempt to raise a disputed issue of fact and make an argument that their cabin has
22  been "grandfathered," that argument will be addressed in the appropriate section.

23          [6]  It appears that the Biggs had permission of these owners to work the claims; however,
the available evidence demonstrates that they were vacationing and/or residing on the property in
24  lieu of mining.

25          [7]  Plaintiff's originally submitted exhibit indicated that P.D. Vail sold his claims to Ed
Brounciser and Bep Athanassion; however, a later search by the government's Forest Service
26  management indicates that this transaction could not be confirmed.  Ex. A., Pl.'s Mem. P. & A.
Supp. Mot. Summ. J., Attachment 7; Schimke Supp. Decl., ¶¶ 7, 23.

as CAMC 272267.[8]  Schimke Decl., ¶ 2.  The mining claims and their history are outlined here.

CAMC 51151 & 51152

1933 - Alice and John Leonard recorded two mining claims, referred to as "Crescent Extension Placer Mining Claim and Crescent #2 Mining Claim."

1979 - 1992 - Biggs filed proofs of Labor and Assessment Work Notices on these claims.

1993 - Bureau of Land Management ("BLM") issued decision, declaring these claims abandoned and void for failure to file affidavit of assessment work notice for 1991.  Biggs appealed, and appeal was dismissed by BLM.  Ex. C., Pl.'s Mem. P. & A. Supp. Mot. Summ. J., Schimke Decl. ¶ 1.

CAMC 258932 & 259833

May 28, 1993 - Biggs recorded two new notice of locations on same land as Crescent mining claims.

December 8, 1993 - BLM issued decision, declaring claims abandoned and void for failure to pay $100 per claim rental fees for 1994.  This decision was not appealed.  Id. at ¶¶ 4, 5.

CAMC 262644 & 262645

April 4, 1994 - Biggs recorded two new notice of locations on same land as Crescent mining claims.

June 11, 1998 - BLM issued a decision, declaring claims abandoned and void for failure to pay $100 per claim rental fees for 1998.  This decision was not appealed.  Id. at ¶¶ 6, 7.

CAMC 272267 & 272268

    The unauthorized structures are on Crescent No. 2 mining claim registered as CAMC 272267.  Schimke Supp. Decl., ¶ 2; Schimke Decl. Re Ownership of Structures, filed October 27,

---

[8]  Although there are other active mining claims owned by Howard and Betty Evans, also registered under the names "Crescent Extension" and "Crescent #2," which are on the same legal land description as the Biggs' claims, they are adjacent to the Biggs' claims and do not overlap with the Biggs' claims.  Schimke Supp. Decl., ¶ 12, attach. 5.  There are no other parties who have located intervening claims on the same lands identified as Crescent Extension and Crescent #2.  Id. at ¶ 15.

1    2006, Attach. 9 at 2.

2    August 14, 1974 - Owner of Crescent No. 2, P.D. Vail, filed a Proof of Labor.  Schimke Supp.

3    Decl., Attach. 8.  This document indicates Vail owned the claim upon which the unauthorized

4    structures are located in 1974.  Id.

5    September 29, 1975 - Biggs filed a Proof of Labor on Crescent No. 2 mining claim.  Id. at

6    Attach. 9.  This document indicates Biggs owned the claim upon which the unauthorized

7    structures are located in 1975.  Id.

8    September 1, 1997 - Biggs recorded two new notice of locations on same land as Crescent

9    mining claims.  Annual fees have been paid, and these claims are active.  Schimke Decl. Re

10   Ownership of Structures, at ¶ 8.  The Bureau of Land Management designated these claims

11   numbers 272266 and 272267.  Id.; Attach. 9.

12          In 1974, upon application by P.D. Vail, the Forest Service approved construction

13   of an equipment shed on Vail's mining claim, with the condition that it was needed and used for

14   mining operations, and would be removed when such operations were discontinued.  Id. at

15   Attachment 1.  Prior to June 7, 1994, the Forest Service had conversations with both Vail and

16   Biggs where they were reminded that a cabin was not authorized on the mining claim.[9]  On June

17   7, 1974, the Forest Service visited the property and discovered that Biggs was erecting a 14 foot

18   by 16 foot cabin (20 feet by 20 feet with porch and deck), and other unauthorized structures.  At

19   that time, Biggs was told to reduce the structure to the shed size of ten feet by 12 feet, and that it

20   could not have windows, cook stove, lights, shower, beds, toilet, and other living amenities.

21   Biggs was warned that legal action would be taken against him if he did not comply.  Id. at

22   Attachment 4.  Biggs intended to develop a mining claim by the fall of 1975; therefore, the

23   Forest Service informed him that it would delay a mineral examination of the claim until that

24   time.  He was told not to further improve the cabin until a discovery point with a profitable gold

25   

26          [9] The legal relationship between Vail and Biggs during this time period is not clear.

1    deposit was designated, and if one was not designated, he would have to restore the property to

2    its original condition.  Id. at Attachment 6.  Although there is an indication that Vail sold his

3    interest in his mining claim to Brounciser and Athanassion on August 2, 1974, the evidence

4    indicates he sold his interest to Biggs.  Id. at Attachment 7; Schimke Supp. Decl., ¶¶ 19-23.  In

5    fact, there is no record of sale of these claims to Brounciser or Athanassion, and the Biggs are the

6    only owners of record for the subject mining claims.  Id. at ¶ 23.

7         On August 6, 1974, Biggs was informed by the Forest Service that he was not

8    authorized to improve the main road to the mining claims.  Id. at Attachment 8.  On January 21,

9    1975, the Forest Service sent Biggs new regulations, advising him that under these new

10   regulations he had 120 days to submit a Plan of Operations ("POO").  Id. at Attachment 9.[10]

11   Between 1975 and 1982, the Forest Service scheduled and rescheduled mineral examinations of

12   Biggs' mining claims, and finally inspected the claims on June 29, 1982.  Id. at Attachments 10,

13   11, 12, 14.  No other action was taken until 1996 when the Forest Service advised Biggs that for

14   twenty years he had ignored the authority of the Forest Service, had accumulated increasing

15   structures, property and debris on the land, and advised him that he was required to file a POO

16   before conducting any mining activities on any unpatented mining claims in which he might have

17   an interest.  Id. at Attachment 15.

18        The Biggs resided there for periods of time, ostensibly pursuant to their two

19   mining claims.  When the Biggs finally submitted a POO for suction dredging operations on June

20   21, 1999, they claimed the 16 foot by 14 foot shed was "grandfathered."  Id. at Attachment 19.

21   On July 23, 2002, a Surface Use Determination was issued regarding the Biggs' mining claims,

22   wherein it was determined that the cabin and all other structures were unnecessary and

23

24        [10]  The letter states that anyone who was previously conducting operations when the new
     regulations were effective, who would have been required to submit a POO, could continue
25   operations, but had 120 days thereafter to submit a plan.  Id.  Biggs was informed if he was not
     sure if his mining activity would require an operating plan, he should file a "notice of intention,"
26   as provided by the regulations.

1   unreasonable for the type of operation proposed and should be removed.  Id. at Attachment 30.

2   On February 3, 2003, the Forest Service issued an administrative decision declaring that based on

3   the Surface Use Determination, Biggs had 120 days to remove the outhouse, and three years to

4   remove the bath/shower structure and cabin.  Id. at Attachment 31.  The Biggs did not appeal this

5   decision.  Id., Schimke Decl, ¶ 3.  On January 6, 2004, the Forest Service approved the suction

6   dredging operations only, and maintained its earlier decision that it would remove the structures

7   if Biggs did not post a bond for their removal within 45 days.  It changed the earlier letter by

8   advising Biggs that since he failed to submit a removal plan, he no longer had three years to

9   remove the cabin.  Id. at Attachment 36.  On April 2, 2004, the Forest Service informed the

10  Biggs that the bond had not been received, and the 45 day appeal period had passed.  Id. at

11  Attachment 38.  On April 20, 2004, the Forest Service received a letter from Biggs, dated April

12  14, 2004, in which he purports to appeal the January 6, 2004 decision.[11]  Id. at Attachment 42.

13  On May 4, 2004, the Forest Service rejected this attempted appeal and informed Biggs that it was

14  referring the matter to the U.S. Attorney's Office.  Id. at Attachment 45.

15          The Biggs have continued to refuse to remove the structures, although by April

16  13, 2004, the hot tub and most of the items inside the cabin had been removed.  Id. at Attachment

17  41.  Although the Biggs claim to use the site for mining purposes, Mr. Biggs admitted at

18  deposition that in the past 34 years of suction dredging for gold, he has recovered less than ten

19  ounces of gold.  Ex. B., Pl.'s Mem. P. & A. Supp. Mot. Summ. J.  The government therefore

20  seeks injunctive relief to remove the unauthorized structures in its first cause of action.

21          As a result of the unauthorized structures, and the fact that the Biggs' mining

22  claims were declared void by the BLM in 1993 and 1998, for the Biggs' failure to file an

23  affidavit of assessment work notice for the year 1994, and for failure to pay maintenance fees,

24  the government, in its second cause of action, seeks an order that all structures including the

25  _____

26      [11]  It also received a copy of the April 20th letter on April 22.  Id. at Attachment 43.

1  cabin, became the property of the United States.  Although the Biggs later recorded two new

2  notice of locations in 1997, and have maintained active mining claims on this property, the

3  structures did not re-vest with the Biggs, according to the government.  The government seeks

4  declaratory relief that it is the sole owner of the structures.

5      The third cause of action relates to the Biggs' actions of filing false and fraudulent

6  Uniform Commercial Code ("UCC") financing statements and liens with the California Secretary

7  of State in September, 2005, a "Foreign Judgment," and "claims in Admiralty" against the

8  personal property of eight Forest Service employees and Assistant U.S. Attorney John Gisla,

9  assertedly in retaliation for enforcing the law pertaining to unauthorized structures on Forest

10 Service lands.  The "notice in admiralty file on demand," attempts to create a false debt against

11 the nine federal government employees in the amount of $194,530,000.  The government seeks

12 declaratory and injunctive relief, as well as statutory damages in regard to this cause of action.

13     The only fact which the Biggs appear to dispute relates to their defense that the

14 Forest Service agents represented over the years that the structures in their mining camp were

15 grandfathered and acceptable.

16 IV.  DISCUSSION

17     A.  Mining Law

18     The 1872 Mining Law, 30 U.S.C. §§ 22-54, allows citizens to locate mining

19 claims on public lands open to location.  Independence Mining Co., Inc. v. Babbitt, 105 F.3d

20 502, 506 (9th Cir. 1997).  If a valuable mineral deposit is discovered, a claim may be held

21 indefinitely so long as certain requirements are met.  See id.  Without the discovery of a valuable

22 mineral deposit, no rights arise under the mining laws.  Id.  Where a valuable deposit has been

23 found, a claimant has the right to possession and enjoyment of the surface, while the United

24 States retains title to the land.  Cal. Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 575

25 (1987).

26 \\\\\

The right to possess public lands under the 1872 Mining Law is subject to a good faith requirement.  United States v. Bagwell, 961 F.2d 1450, 1453 (9th Cir. 1992).  A claim by the United States seeking to terminate occupancy of a mining claim may properly be brought before a district court.  See id. at 1454 (stating that the power to make such a determination stems from the court's jurisdiction to vindicate the United States' possessory interest in public lands). In deciding whether occupation of public lands is in good faith, courts consider 1) the extent to which the lands are being used for purposes other than mining, and 2) whether a reasonably prudent person would be justified in continued expense in developing the claim.  Id. at 1455.  In analyzing the first factor, courts have considered 1) whether the lands are being used for residential or non-mining purposes, 2) the extent of the land's value for purposes other than mining, 3) the amount of ore that has been mined, 4) significant periods of non-mining activity, and 5) activity or improvements indicating a good faith intent to undertake mining in the immediate future.  Id.  In analyzing  whether a reasonably prudent person would be justified in continued expense, courts have considered 1) the length of time for which no mining activities have occurred, 2) the condition of the mine, 3) the potential sources of ore for the mill, 4) the market for processed ore, and 5) operating costs.  Id.

> As recognized by the Forest Service regulations, the operating plan is at the heart of the creation of an authorized claim. 36 CFR §§ 228.4-228.7.  Rare indeed will be the mining claim that does not require the submission of a plan.  (footnote omitted).  It is fair to say in the vast majority of cases that the approval of the operating plan is the administrative action which vests the miner with the above described property interest.

U.S. v. Hall, 751 F. Supp. 1380, 1382 (E. D. Cal. 1990).

> Certain activities are prohibited without specific authorization, including:

> (a) Constructing, placing, or maintaining any kind of road, trail, structure, fence, enclosure, communications equipment, or other improvement on National Forest System lands or facilities without a special use authorization, contract, or approved operating plan, unless such authorization, contract, or operating plan is waived pursuant to § 251.50(e) of this chapter.

1           (b) Taking possession of, occupying, or otherwise using National
       Forest System lands for residential purposes without a special-use
2           authorization, or as otherwise authorized by Federal law or
       regulation.

3

4    36 C.F.R. § 261.10(a)(b).

5         B. <u>Removal of Unauthorized Structures</u>

6              The government contends that the Biggs' mining claims are subject to Forest

7    Service rules and regulations, and that defendants cannot residentially occupy or maintain

8    structures on their mining claims without an approved POO.  The government asserts that since

9    the Biggs did not administratively appeal the February 3, 2003 Forest Service decision to remove

10   the structures, that decision is not subject to challenge.  According to the government, the Biggs

11   never received an approved POO to construct or maintain a 14 foot by 16 foot cabin or other

12   structure on their mining claims.

13             The Biggs argue only that their structures have been grandfathered.  They state,

14   "the United States Forest Service agents led the Defendants over the years to believe that if they

15   cleaned up their mining camp after thirty five (35) years of operations and many orders from

16   Forest Service agents to <u>bring trailers and campers to establish that the defendants justify having</u>

17   <u>their storage shed and other facilities, including the bath area outdoor toilet, the cabin was</u>

18   <u>acceptable under the Grandfather Clause</u>."  (Docket  #75 at 8:3-8.)  (emphasis in original.)  The

19   Biggs claim that witness Sylvia Shorter was present when agent Richard Zimbeck and Jean

20   Masquelier told Betty Biggs that they had grandfathered the structures on the Biggs' mining

21   claims.  The Biggs submit that Shorter is available for testimony or by affidavit; however, they

22   have not submitted any admissible evidence by this witness.  (<u>Id.</u> at 8:14-18.)  The government

23   has submitted writings by the Biggs in which these defendants claim their cabin was

24   grandfathered; however, there is no evidence that the government made such a representation to

25   the Biggs. Ex. A., Pl.'s Mem. P. & A. Supp. Mot. Summ. J., Attachments 19, 28, 40, 46.

26   Rather, the Forest Service's Surface Use Determination stated, "[t]he claimants cabin, bathhouse,

1   and tub are unnecessary and unreasonable for the type of operation proposed and should be

2   removed." Id., Ex. A, Attachment 30, at 7.  Based on that determination, the Forest Service

3   issued its administrative decision requiring the Biggs to remove the structures within a specific

4   time schedule.  Id., Ex. A., Attachment 31.  The Biggs were advised of their right to

5   administratively appeal this decision, but they did not do so.  Id., Ex. A., Attachment 33.

6         Even if the vague assertions proffered by the Biggs of government official

7   representations that their unlawful structure(s) could be grandfathered were enough to constitute

8   "admissions," and hence issues of fact, it remains clear beyond any doubt that such an issue of

9   fact would be immaterial.  The Biggs, in essence, declare that the government is estopped from

10   acting contrary to its former representations.  The Biggs' assertions follow the time worn path,

11   with its equally time worn rejections in all contexts, of attempting estoppel against the

12   government.  If the government can be estopped at all, the person so attempting must show that

13   the government engaged in "affirmative misconduct."  Socop-Gonzalez v. INS, 272 F.3d 1176,

14   1184 (9th Cir. 2001) (en banc).  "We have previously defined 'affirmative misconduct' to mean a

15   'deliberate lie' or a 'pattern of false promises.'  Negligently providing misinformation...does not

16   meet this definition.'"  Id.  The vague assertions of " the government told me I could do what I

17   was not supposed to do," in terms of grandfathering unlawful structures does not in any way,

18   shape or form constitute affirmative misconduct.

19         The remaining issue is whether the Biggs have complied with applicable rules and

20   regulations.  Undisputed is that they have not.  The government has provided evidence of long-

21   standing residential occupancy and maintenance of structures on the subject mining claims

22   without an approved Plan of Operations.  The Biggs have raised only unmeritorious legal claims

23   in opposition to the evidence of the government, and they have failed to raise a disputed issue of

24   fact to controvert the evidence the government submitted  – they have failed to present any

25   factual predicate from which to draw even an inference in their favor.  Because there are no facts

26   which require a jury to resolve, judgment on the record is appropriate.

The Secretary of Agriculture has issued regulations for surface use of National Forest System lands in connection with mining.  36 C.F.R. §§ 228.1-228.15.  Any proposed operation which "will likely cause significant disturbance of surface resources," must have an approved plan of operations.  See e.g., United States v. Langley, 587 F. Supp. 1258, 1266 (E.D. Cal. 1984) ("The court finds as a matter of law that the maintenance of a fixed residence by defendant creates a sufficiently significant surface disturbance as to require an approved POO [Plan of Operations] pursuant to 36 C.F.R. 228.").  United States v. Hall, 751 F. Supp. at 1382 ("[T]he operating plan is at the heart of the creation of an authorized claim . . . Rare indeed will be the mining claim that does not require the submission of a plan.").  Similarly, Forest Service Regulations require an approved operating plan prior to constructing or maintaining structures or improvements on National Forest Service lands.  36 C.F.R. § 261.10(a).  Undisputed is that unauthorized structures and improvements exist on the Biggs' mining claims.  Ex. A., Pl.'s Mem. P. & A. Supp. Mot. Summ. J., Attachment 4.  Forest Service regulations not only state that erecting a structure requires authorization, but also that *maintaining* a structure requires authorization.  36 C.F.R. § 261.10(a); see also United States v. Burnett, 750 F. Supp. 1029, 1033 (D. Idaho 1990) ("the structures and personal property must be removed from the mining claims because [claimant] does not have the requisite approval to keep the structures and personal property on the claims.").  Although the Biggs eventually submitted a proposed POO in June, 1999, the Forest Service issued an administrative decision to remove the structures, and the Biggs did not appeal it.  Ex. A., Pl.'s Mem. P. & A. Supp. Mot. Summ. J., Attachment 31.  Undisputed is that the Biggs never received an approved POO to construct or maintain structures on their mining claims.  Ex. A., Pl.'s Mem. P. & A. Supp. Mot. Summ. J., Attachment 31; Schimke Decl., ¶¶ 31, 33.  Therefore, the structures are in violation of federal law and must be removed.

Federal courts may order claimants to remove unauthorized structures and property from National Forest System lands.  See e.g., United States v. Brunskill, 792 F.2d 938

1   (9th Cir. 1986) (requiring claimants without POO to remove unauthorized structures); United

2   States v. Goldfield Deep Mines Co. of Nevada, 644 F. 2d 1307 (9th Cir. 1981) (upholding

3   district court order requiring removal of trespassing structures and equipment); United States v.

4   Burnett, 750 F. Supp. 1029 (D. Idaho 1990) (claimants without POO required to remove

5   unauthorized structures).

6           Moreover, because defendants do not have an approved POO, the court should

7   prohibit any residential occupancy.  See United States v. Langley, 587 F. Supp. 1258 (E.D. Cal.

8   1984) (enjoining mining claimant from residing on the claim, occupying structures, or other

9   habitations); United States v. Smith Christian Min. Enterprises, Inc., 537 F. Supp. 57 (D.Or.

10  1981) (ordering claimants to remove themselves and their possessions from the land by a

11  specified date and directing that if they do not, the remaining structures will be deemed the

12  property of the United States).  An injunction should be entered to vacate the claims, order

13  defendants to remove all structures and personal property from the claims, permit the government

14  to take possession of all remaining structures and personal property not timely removed by

15  defendants, issue a writ of ejectment to permit officers of the United States to physically remove

16  defendants and any unauthorized persons from the claims if they have not removed the structures

17  within the time permitted, and prohibit defendants and others acting in concert with them from

18  using the claims when in violation of federal law or this order.[12]

19        C.  The United States Maintains Ownership of the Structures

20          The government next seeks to establish there is no dispute of fact that the cabin on

21  the Biggs' mining claims became the property of the government when the claims were

22  determined to be void in 1993 and 1998.

23          Brothers v. United States, 594 F.2d 740 (9th Cir. 1979), involved a claimant's

24  abandonment of a mining claim on federal lands; the reversion of two cabins located on that

25

26      [12]  The government's request to order defendants to refrain from occupying or using other
federal lands unless they comply with the law should be denied as premature and unnecessary.

claim to the federal government; the relocation of the claim by subsequent claimants who filed a

claim coinciding with the boundaries of the original claim; and a dispute regarding the

government's ownership of the cabins and the subsequent claimants' right to possess them.  594

F.2d at 740-41.  The subsequent claimants argued that when they relocated their claim, the

buildings as well as the land vested in them.  Id. at 741.  In concluding that the action had been

properly dismissed by the district court, the Ninth Circuit squarely rejected plaintiffs' argument,

stating

> The plaintiffs had notice that the cabins had been abandoned to the
> government. The fact that the Forest Service gave [the former
> claimant] permission to remove them after the abandonment does
> not give the plaintiffs any rights or interest in them.

> We conclude that the plaintiffs failed to establish a possessory
> interest in the cabins and we need not reach the question whether
> they were unlawfully taken by the government.

Brothers, 594 F.2d at 741.

While the decision in Brothers was announced more than twenty-five years ago,

its holding has never been questioned.  Finding the decision in Brothers controlling in the case of

another dispute over ownership of the structures and personal property located on a relocated

mining claim, one district court held:

> Stated differently, when the Barnes' and the Hagamans validly
> relocated the mining claims, they did not get a possessory interest
> in the structures and personal property.  What they received was an
> interest in the mining claims, less the structures and personal
> property.  When Burnett subsequently purchased or received their
> interests in the claims, he succeeded to just the mining claims as
> well, with no possessory interest.  The Ninth Circuit case law
> seems to be consistent with this view.  See Brothers v. United
> States, 594 F.2d 740 (9th Cir. 1979).  In Brothers, the plaintiffs
> brought an inverse condemnation suit against the Forest Service,
> claiming that the Forest Service had wrongfully taken a mining
> claim and two cabins located on the claim.  The plaintiffs in
> Brothers argued that once they relocated the abandoned mining
> claim, the cabins, as well as the land, vested in them.  They argued
> this, despite conceding the fact that the mining claims and
> buildings reverted to the United States when abandoned by the
> previous locator.  Id. at 740-41.  The Ninth Circuit specifically

15

1                 disagreed and pointed out that the plaintiffs had notice that the
cabins had been abandoned to the government and that their
2                 predecessor was only granted permission to remove the cabins.
Based upon this, the court found that the plaintiffs did not have any
3                 rights or interest in the cabins.  Id. at 741-42.  Thus, the court finds
the Brothers case controlling.
4

5   United States v. Burnett, 750 F. Supp. 1029, 1032 (D. Idaho 1990).

6               Under the decision in Brothers, the Biggs have no possessory interest in the cabin.

7 It is undisputed that the BLM declared both of the Biggs' mining claims void on April 27, 1993,

8 and although the Biggs appealed that decision, the appeal was dismissed by the BLM.  Ex. C.,

9 Pl.'s Mem. P. & A. Supp. Mot. Summ. J., Schimke Decl., ¶ 3,Attachments 2, 3, 4.  On December

10 8, 1993, the BLM also declared void other mining claims recorded by the Biggs on May 28,

11 1993.  This decision was not appealed.  Id., ¶¶ 4, 5, Attachments 5, 6.  The BLM declared two

12 additional mining claims, recorded April 4, 1994, forfeited by operation of law on June 11, 1998.

13 This decision was not appealed.  Id., ¶¶ 6, 7, Attachments 7, 8.  Ownership of the structures

14 reverted to the government in 1993, and did not re-vest with the Biggs when they later recorded

15 new mining claims in 1997.[13]

16            D.  Defendants' False Financing Statements

17               The government seeks relief from false financing statements filed against nine

18 federal employees, through the fraud injunction statute, 18 U.S.C. § 1345, the False Claims Act,

19 31 U.S.C. §§ 3729, et seq., and the California Commercial Code, §§ 9509, 9625.

20            1.  Fraud Injunction Statute

21               The statute providing for injunctions against fraud states in part that if someone is

22 violating or about to violate chapter 63 (mail fraud), the Attorney General may commence a civil

23 action to enjoin such violation.  18 U.S.C. § 1345 (a)(1)(A).  The mail fraud statute provides:

24

_____

25       [13]  It is unclear what, if any property reverted to the government as a result of its 1998
decision, as it appears that all property previously had reverted to the government as a result of
26 its 1993 decision.

1
2
3
4

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, ..., for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ..., shall be fined under this title or imprisoned not more than 20 years, or both.

5   18 U.S.C. § 1345.

6        It is undisputed that Biggs filed and served a set of false Admiralty papers on

7   December 22, 2005, which attempts to create a judgment against the nine federal employees as

8   debtors in the amount of $194,530,000.  Ex. D., Pl.'s Mem. P. & A. Supp. Mot. Summ. J.  It is

9   also undisputed that the Biggs filed UCC financing statements with the California Secretary of

10  State which contained false information regarding the nine federal employees.  These statements

11  attempted to create a lien against the personal property of these nine employees.  Id.  Both sets of

12  papers were filed with this court.  (Docket #27.)  All of these papers were sent through the U.S.

13  mail.  Ex. D., Pl.'s Mem. P. & A. Supp. Mot. Summ. J.  It is undisputed that there are no grounds

14  for a lien or judgments against these nine employees, and therefore the papers filed by Biggs are

15  fraudulent.  Ex. E, ¶ 3, Pl.'s Mem. P. & A. Supp. Mot. Summ. J.[14]  The undersigned finds that by

16  submitting false papers by mail, the Biggs did indeed intend to obtain property, i.e., the cabin and

17  other fixtures, in the hopes that through intimidation of officers, the United States would cease to

18  "bother" the Biggs, now and in the future.[15]  See United States v. Pinkston, 2007 WL 1437690

19  (W.D. Texas 2007).  As there are no disputed facts concerning these violations, the government

20  is entitled to a permanent injunction.

21              2.  False Claims Act

22        The aforementioned acts by defendants also qualify as violations of the False

23  Claims Act.  It provides that a person who "knowingly presents, or causes to be presented, to an

24

25        [14]  Exhibit E does not contain John Gisla's signature; however, defendants have not objected.  Therefore, the court will presume Gisla joins in the declaration.

26        [15]The scheme appears to be one of extortion as well.

1   officer or employee of the United States Government ... a false or fraudulent claim for payment

2   or approval ... is liable to the United States Government for a civil penalty of not less than $5,000

3   and not more than $10,000, plus 3 times the amount of damages which the Government sustains

4   because of the act of that person....”

5   31 U.S.C. § 3729(a).

6           As the evidence set forth in the preceding section indicates, the Biggs' filing of

7   December 22, 2005 constitutes a false and fraudulent claim for payment against the nine federal

8   employees, and was presented to them.  United States v. Orrego, 2004 WL 1447954 (E.D.N.Y.

9   2004).  But see U.S. v. Pinkston, 2007 WL 1437690, *7, n.66 (W.D. Tex. May 14, 2007)

10  (finding that lien was not claim because no evidence that defendant demanded payment, such as

11  by submitting an invoice).  Here, the Biggs do not dispute this point of law and the Admiralty

12  papers, misguided as they are, constitute the claim.  Nothing in the False Claims Act requires the

13  claim to be well conceived in addition to fraudulent.  Based on the patently false papers which

14  show malicious intent, the government's request for the maximum penalty of $10,000 should be

15  granted.

16          3.  False Financing Statements Under the California Commercial Code

17          The individual defendants also seek relief from the false financing statements

18  under the California Commercial Code which provides:

19          a) A person may file an initial financing statement,...  only if either
            of the following conditions is satisfied:
20          (1) The debtor authorizes the filing in an authenticated record or
            pursuant to subdivision (b) or (c).
21          (2) ...
            (b) By authenticating or becoming bound as debtor by a security
22          agreement, a debtor or new debtor authorizes the filing of an initial
            financing statement, ....

23

24  Cal. Com. Code § 9509 (West 2001).[16]  Based on the undisputed facts and evidence submitted by

25  ───────────────────

26      [16]  The court finds that it has supplemental jurisdiction to entertain the claims of the
    individual government employees pursuant to 28 U.S.C. § 1367.  Jurisdiction under 28 U.S.C. §

1  the government, as outlined in the previous sections, the government is entitled to the following

2  remedies for the filing of a false financing statement.

3       Cal. Com. Code § 9625 provides that in addition to damages for actual loss, a

4  person named as a debtor may recover $500 from the person who files a record under § 9509

5  which he or she is not entitled to file.  Therefore, each of the nine federal employees is entitled to

6  $500 in statutory damages.

7       Additionally, § 9625 provides that the individual employees are entitled to

8  declaratory and injunctive relief for the defendants' filing of a false financing statement: "(a) If it

9  is established that a secured party is not proceeding in accordance with this division, a court may

10  order or restrain collection, enforcement, or disposition of collateral on appropriate terms and

11  conditions."

12       Therefore, the employees are entitled to its requested relief of an order declaring

13  the financing statements void, authorizing the California Secretary of State to expunge them from

14  the public record, and enjoining defendants from filing any more financing statements.

15  V.  <u>CONCLUSION</u>

16       Accordingly, IT IS ORDERED that defendants' motion to dismiss, filed February

17  5, 2007, is construed as an opposition to the government's motion for summary judgment.

18       For the reasons stated in this decision, IT IS HEREBY RECOMMENDED that:

19       1.  The government's October 27, 2006, summary judgment motion be granted

20  and judgment be entered in favor of the government;

21       2.  Defendants, and all those acting in concert with them, be ordered to vacate the

22  unauthorized structures, including the 14'x16' cabin, on Defendants' Crescent Extension and

23  Crescent #2 mining claims, within thirty (30) days of entry of the order of the Court;

24  \\\\\

25

26  1345 would not be appropriate in that the officers of the United States have not (as of yet) been expressly authorized to sue under an Act of Congress.

3.   Defendants, and all those acting in concert with them, be ordered to remove from their Crescent Extension and Crescent #2 mining claims all unauthorized buildings, structures, equipment and personal property within ninety (90) days of entry of the order of the Court;

4.   Plaintiff United States be permitted to take possession of all unauthorized buildings, structures, equipment and personal property not timely removed by Defendants, and to dispose of it without further order of the Court, notice, administrative action or accounting;

5.   The Court issue a writ of ejectment so that officers of the United States, including the U.S. Marshal and U.S. Forest Service law enforcement officials, may physically remove Defendants and other unauthorized persons from the unauthorized structures on Defendants' Crescent Extension and Crescent #2 mining claims if Defendants, and anyone acting in concert with them, fail to vacate and remove the structures within the time ordered by the Court;

6.   An injunction be issued prohibiting Defendants, and all those acting in concert with them, from occupying or using their Crescent Extension and Crescent #2 mining claims if such use is in violation of federal law or this Order;

7.   An order issue declaring that the United States of America is the sole owner of all structures, including the 14'x16' cabin, located on Defendants' Crescent Extension and Crescent #2 mining claims; that Defendants have no legal interest in the structures located on Defendants' Crescent Extension and Crescent #2 mining claims; and that the United States of America has the legal right to remove all structures located on Defendants' Crescent Extension and Crescent #2 mining claim, with no notice or compensation owing to Defendants.

8.   An order issue declaring that all Financing Statements, liens, Judgments and Claims of any type, including all "Admiralty" claims, filed or presented by William Biggs against the person or property of the nine named Federal employees are false, fraudulent, invalid, null, void, and of no legal effect;

9.  An order issue granting leave to the government to file the judgment and order of this court with the California Secretary of State, and permitting the Secretary of State to expunge and remove from all public records each of the false and fraudulent financing statements filed by William Biggs against the property of the nine Federal employees;

10.  With respect to any dispute directly or indirectly related to the issues and property in this case, William Biggs and his agents, employees and any others in active concert or participation with him be permanently enjoined from taking the following actions: a. Filing or recording any document or instrument of any description, including UCC Financing Statements, judgments and "admiralty claims," which purport to create a debt, lien or record of any kind against the person or property of the nine Federal employees, or any other federal officer or employee, without the prior order of this court; and b. Attempting to enforce any Financing Statement, lien, judgment or claim of any kind, including any "Admiralty" claim, against the person or property of the nine Federal employees, or any other federal officer or employee, without the prior order of a recognized court;[17]

11.  William Biggs be ordered to pay to each of the nine Federal employees statutory damages of $500 pursuant to California Commercial Code § 9625; and

12.  William Biggs be ordered to pay to the United States of America a civil penalty of $10,000 pursuant to the False Claims Act.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within ten (10) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

---

[17]  The government's request for an order prohibiting the Biggs from taking action to retaliate against or harass the nine Federal employees is denied as unnecessary since the Biggs are under an ongoing obligation to follow the law.

1  shall be served and filed within ten (10) days after service of the objections.  The parties are

2  advised that failure to file objections within the specified time may waive the right to appeal the

3  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

4  DATED: 11/6/07

/s/ Gregory G. Hollows

5

GREGORY G. HOLLOWS
6                                                                              U. S. MAGISTRATE JUDGE

GGH:076:USBiggs1263.msj.wpd

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26